## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **LAIRD J. HEAL,** ) | |
| **Plaintiff,** ) | **CIVIL ACTION** |
| ) | |
| **v.** ) | **NO. 17-11918-TSH** |
| ) | |
| **WELLS FARGO, N.A., AS TRUSTEE FOR** ) | |
| **WAMU MORTGAGE PASS-THROUGH** ) | |
| **CERTIFICATES SERVICES 2006-PR2** ) | |
| **TRUST, JPMORGAN CHASE BANK,** ) | |
| **NATIONAL ASSOCIATION,** ) | |
| **MORTGAGE CONTRACTING SERVICE** ) | |
| **LLC, D/B/A MORTGAGE** ) | |
| **CONTRACTING SERVICE, JOHN DOE 1,** ) | |
| **JOHN DOE 2, JOHN DOE 3 and JOHN** ) | |
| **DOE 4,** ) | |
| **Defendants.** ) | |

## MEMORANDUM AND ORDER ON CROSS MOTIONS TO STRIKE AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGEMENT (Docket Nos. 143, 148, 162, 163, 164, 166, 170)

**September 1, 2021**

**HILLMAN, D.J.**

Mark Paoluccio and Laird J. Heal, Paoluccio's tenant (collectively, "Plaintiffs"), brought this action asserting Forcible Entry (Count I), Breach of Contract (Count II), Trespass to Chattel (Count III), Conversion (Count IV), and Breach of Fiduciary Duty (Count V) claims in connection with Defendants' pre-foreclosure activity on Paoluccio's mortgaged property in Winchendon, Massachusetts.   Plaintiffs allege that from 2012 to 2018 Defendants repeatedly entered the property illegally and removed or stole Heal's possessions, including an antique gold

coin, changed the locks, shut off utilities, and nailed the windows shut.  The mortgagor, Paoluccio, voluntarily dismissed his claims after the Winchendon property was foreclosed in 2018, leaving Heal the sole Plaintiff.  I granted summary judgment on Counts II and V, and have capped Heal's damages for the gold coin at $500, adjusted for inflation.  (Docket No. 46).

Before the Court are Wells Fargo Bank and JP Morgan Chase's ("Bank Defendants") and Mortgage Contracting Services' ("MCS") motions for summary judgment on Counts I (Forcible Entry), III (Trespass to Chattels), and IV (Conversion).  (Docket Nos. 143, 148).   Also pending are five motions to strike portions of both parties' summary judgment pleadings. (Docket Nos. 162, 163, 164, 166, 170).

For the reasons stated below, Plaintiff's Motion to Strike Bank Defendants' Statement of Material Facts (Docket No. 162) is ***<u>granted in part and denied in part</u>***; Plaintiff's Motion to Strike MCS' Statement of Material Facts (Docket No. 163) is ***<u>granted in part and denied in part</u>***; Plaintiff's Motion to Strike the Benavidez Affidavit (Docket No. 164) is ***<u>denied</u>***; Bank Defendants' Motion to Strike Plaintiff's Affidavit (Docket No. 166) is ***<u>granted</u>***; and MCS' Motion to Strike Plaintiff's Affidavit (Docket No. 170) is ***<u>granted in part and denied in part</u>***. Bank Defendants and MCS' motions for summary judgment (Docket Nos. 143, 148) are ***<u>granted</u>*** on all counts in accordance with this memorandum of decision.

## I.     <u>Background</u>

*The Mortgage*

On January 12, 2006, Mark Paoluccio granted a mortgage on his duplex apartment at 8 Linden Street in Winchendon (the "Property") to Washington Mutual Bank.  (Mortgage, Docket No. 151-1 at 2).  JP Morgan Chase, Washington Mutual's successor in interest, assigned the

mortgage to Wells Fargo Bank in March 2012 and remained the mortgage servicer. (Assignment, Docket No. 151-2).

The mortgage's Uniform Covenants required the borrower (Paoluccio) to keep the Property in good condition and repair to prevent any decrease in value.  (Mortgage ¶ 7, Docket No. 151 at 8-9).  It also authorized the lender or its agent to "make reasonable entries upon and inspections of the Property."  (*Id*.).  With reasonable cause, the lender could inspect the interior of the Property, so long as the lender gave the borrower "notice at the time of or prior to such an interior inspection specifying the reasonable cause." (*Id*.).

 If the borrower violated the mortgage terms, a legal proceeding significantly affected the lender's interest in the Property, or the borrower abandoned the Property, the lender could take reasonable or appropriate steps to protect its interest in the Property, including:

> "protecting and/or assessing the value of the Property, and securing and/or repairing the Property. . . [s]ecuring the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on and off."  (¶ 9).

The mortgage agreement did not provide a legal definition for abandonment.

*The Lease*

Paoluccio and Heal entered into a lease agreement in October 2010, under which Heal ("Plaintiff")  agreed to pay $500 per month in rent and maintain the Property.  (Lease Agmt. ¶ 11, Docket No. 151-8 at 4-5).  Plaintiff's maintenance duties included keeping windows, doors, lacks and hardware in good, clean order and repair; not obstructing windows or doors, or leaving them open in inclement weather; and keeping plumbing in good order and repair.  (*Id*.).  Plaintiff claims that aside from a brief period of hospitalization from February—March 2014 he lived continuously at the Property until the foreclosure sale in February 2018, so that it was never

vacant, abandoned, or fell into a state of disrepair. (Docket No. 161, ¶ 44; Foreclosure Deed at 4, Docket No. 151-3).

*The Dispute*

In 2008, Mortgage Contracting Services ("MCS") entered into a contract with JP Morgan Chase to provide property preservation services. (Docket No. 146-1).

When Chase reports that a mortgage loan is delinquent, inspections at the underlying property are automatically triggered. (Nguyen Dep. 42:16-19, Docket No. 151-4). MCS hires vendors to conduct necessary inspections and maintenance work whom it calls field agents. It transmits work orders to its field agents via the Vendor360 online portal. (Benavidez Aff. ¶ 14). MCS' standard practice is to have its field agents conduct inspections at mortgaged properties and leave a vacancy notice at any property which appears to be vacant and abandoned. (Benavidez Aff., ¶ 26). The notices advise residents that MCS will secure the property on behalf of the mortgage lender unless a resident informs MCS that the property is not vacant by calling the posted telephone number. (*Id.*).

Bank Defendants and MCS allege that the Property appeared vacant and unmaintained, which authorized MCS' field agents to conduct the property preservation activities set out in the mortgage for abandoned or unmaintained property, including securing the Property by changing the locks on the doors, boarding up windows, and shutting off utilities. Plaintiff alleges— without providing dates for any of the incidents, or a list of the stolen property— that the Bank Defendants (acting through MCS or MCS' field agents) forced their way inside the Property on multiple occasions, changed the locks three times; "rifled through" his personal property and "took what they felt like;" "turned the electric circuit breaker in the cellar" two times; nailed various doors and windows shut; and told the neighbors to call the police if anyone tried to enter.

4

(Compl. ¶¶ 24-35, Docket No. 1).  As a result, Plaintiff claims he was locked out of the upper

level of the Property for about a year, but provides no dates.

MCS' reports for each inspection, many of which contain photographs, show that its field

agents visited the Property as many as 98 times between July 7, 2012 and January 11, 2018.  (*See*

Ex. 5, Docket No. 146-5).  Most of the visits were to cut grass or perform a visual inspection for

signs of occupancy from the exterior,[1] but some, labelled "winterization," "secure," "initial

secure," or "re-secure," directed field agents to enter the Property and change the locks or install

a lock box, nail windows closed, or take other actions to fortify the house for winter, such as

shutting off utilities, unless the Property was occupied.  (*Id.*).  MCS field agents executed secure

or winterization orders, which involved nailing doors or windows shut, or adding a lockbox, 14

times: August 2, 2012; October 2, 2013; April 20, 2014; June 26, 2014; July 2, 2014; October

11, 2016; April 10, 2017; May 6, 2017; June 1, 2017; and August 29, 2018.  (*Id.*).  MCS' reports

indicate that field agents conducted inspections and posted vacancy notices on: July 11, 2012

(approximately 3 weeks before Property was secured on August 2, 2012; photos of posted

vacancy notice in report); October 7, 2013 (5 days *after* Property was secured on October 2,

2013); October 17, 2013 (six days after the prior secure order; photos of posted vacancy notice

included in report); November 10, 2013 (approximately a month after Property was secured on

photos of vacancy notice included in report); and November 28, 2016 (photos of vacancy notice

included in report; agent reported the Property was partially vacant because the yard was

maintained and people were inside).  (Docket Nos. 146-6; 146-9;146-10; 146-11; 146-15) .

---

[1] For example, the reports note a car in a driveway, a satellite dish, or personal possessions
visible from outside the home through its windows are signs the property may be occupied or
partially vacant, while photographs of overgrown grass or vegetation or a driveway buried deep
in snow indicate that the Property is vacant.

Only one MCS Work Order appears to have authorized MCS field agents to remove any private property from inside the house.  On October 21, 2013, MCS put out a work order for the removal of two cubic yards of raw garbage, including food and trash.  (Docket No. 157-8 at 2). That order was completed on October 24, 2013.  (*Id*).  Photographs in the subsequent report show three or four black garbage bags being filled with non-perishable canned food items, pizza boxes, and other debris.  (*Id*).  The photographs of the interior of the house show kitchen counters strewn with garbage, several cardboard boxes, used bedding, a bare mattress, and a pile of unfolded men's clothing. (*Id*. at 3-10).

*Police Records*

On June 27, 2014, Plaintiff returned to the Property to discover that the locks had been changed, and an MCS notice had been posted on the door. He reported a suspected larceny of an antique gold coin from a locked strongbox inside the Property to the Winchendon Police.  (Police Rep. I, Docket No. 151-9).  The responding officer, Sgt. Anair, visited the Property with Plaintiff.  (*Id*. at 4.).  They entered through a door whose lock had not been changed, and examined the strongbox, which "did not appear to [Sgt. Anair] to have been pried or forced." (*Id*.).  Sgt. Anair reported that the Property exterior appeared "unkempt" and the interior "did not appear to have been lived in."  (*Id*.).  He closed the case because Plaintiff did not follow up and MCS never responded to Sgt. Anair's calls about whether Plaintiff had a right to be inside the Property. (*Id*).

On Friday, July 14, 2014, Winchendon Police responded to a call about the Property. (Police Rep. II, Docket No. 151-11).  Officer Ross spoke with Plaintiff at the Property; Plaintiff could not produce a lease and Officer Ross observed that "there was junk and trash everywhere" and no "furniture that would be in a livable apartment" other than a bare mattress on the floor—

6

in other words, "a squatters lair." (*Id*. at 4). Plaintiff visited the police station three days later and furnished the lease agreement, an affidavit signed by Paoluccio, and a March-April electric bill for more than $5,000 with a notice to terminate service as proof he was Paoluccio's tenant. (*Id*. at 5).

On September 16, 2015, Plaintiff reported another break in at the Property, but told officers he had already reversed the changed door locks before they arrived." (Police Rep. III, Docket No. 151-12 at 4). The police closed the case. *Id*.

On September 5, 2017, the police responded when Stacey Wilson, a CMS vendor, attempted to conduct an interior inspection at the Property when Plaintiff was at the Property. (Police Rep. IV, Docket No. 151-13). Police advised her that she would need an eviction order to conduct the walkthrough. (*Id.*).

## II.    **Procedural History**

On June 29, 2017, Paoluccio and Heal, acting *pro se*,[2] filed a lawsuit in Worcester Superior Court against JP Morgan Chase, Wells Fargo Bank, MCS, and John Does for Forcible Entry (Count 1), Breach of Contract (Count 2), Tort to Chattels (Count 3), Conversion (Count 4), and Breach of Fiduciary Relationship (Wells Fargo only) (Count 5). (Docket No. 1). On Count 1, Plaintiffs sought "an order requiring then [sic] quit up the property and [sic] forever." On the remaining counts, Plaintiffs sought damages based on the damage to the property, the values of the items removed from the property, their pain and suffering, as well as punitive damages. The case was removed to federal court.

---

[2] Plaintiff resigned from the practice of law and the Supreme Judicial Court entered an order of disbarment in 2017. *In re: Laird Hames Heal*, Judgment of Disbarment (Mass. Sup. Jud. Ct. Dec. 22, 2016).

Following the foreclosure, Paoluccio dismissed his claims with prejudice on March 5, 2018, leaving Heal as the sole plaintiff.  (Docket No. 18).  I granted summary judgment on Heal's breach of contract and breach of fiduciary relationship claims because Heal, as a tenant, had no privity in contract or fiduciary relationship with Defendants.  (Docket No. 46).  My order also capped Heal's damages for loss of an antique gold coin at the $500 valuation he attributed to the coin during his 2001 bankruptcy proceedings, adjusted for inflation.  (Docket Nos. 46, 48, 49, 73, 89).

The remaining claims against MCS and the Bank Defendants are forcible entry (Count I), tort to chattels (Count III),[3] and conversion (Count IV).

### III.    Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  A factual dispute precludes summary judgment if it is both "genuine" and "material." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the nonmoving party. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994).  A fact is "material" when it might affect the outcome of the suit under the applicable law. *Id*.

---

[3] There is no tort to chattels cause of action under Massachusetts law, but I have construed the cause of action as trespass to chattels.

The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).  It can meet its burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the nonmoving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005), *aff'd*, 442 F.3d 7 (1st Cir. 2006) (quoting *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548).  Once the moving party shows the absence of any disputed material fact, the burden shifts to the non-moving party to place at least one material fact into dispute. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002) (citation omitted).

## IV.   <u>Discussion</u>

Before the Court reach MCS and the Bank Defendants' motions for summary judgment, it  must consider the five pending motions to strike portions of the summary judgment record.

### A. <u>Motions to Strike</u>

Under Fed. R. Civ. P. 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  When considering a motion for summary judgment, "a court may take into account any material that would be admissible or usable at trial . . . [but] inadmissible evidence may not be considered." *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 2013). "A motion to strike is the appropriate means of objection to the use of affidavit evidence on a motion for summary

judgment." *Facey v. Dickhaut*, 91 F.Supp.3d 12, 19 (D. Mass. 2014).  "The moving party must specify the objectionable portions of the affidavit and the specific grounds for objection. Furthermore, a court will disregard only those portions of an affidavit that are inadmissible and consider the rest of it."  *Casas Office Machines, Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668, 682 (1st Cir. 2014).

### 1.   Plaintiff's First Motion to Strike (Docket No. 162)

Plaintiff seeks to strike dozens of paragraphs in Bank Defendants' Statement of Material Facts (Docket No. 150) on five grounds: (1) neither Wells Fargo nor Chase's initial Rule 26(a)(1) disclosures identified any potential trial witnesses; (2) neither Wells Fargo nor Chase provided the names of the field agents who conducted inspections at the Property in response to Plaintiff's Interrogatories; (3) failure to comply with L.R. 56.1; (4) certain facts are immaterial, lack support or a foundation, or are misleading; and (5) certain facts contain inadmissible hearsay.

First, Plaintiff has not provided any legal precedent that a defendant's failure to disclose potential trial witnesses with its initial disclosures warrants striking its entire statement of material facts.

Second, assuming Bank Defendants had access to and deliberately withheld the names of MCS's field agents in their responses to interrogatories, Plaintiff has not shown why striking their entire statement of material facts is a proportionate remedy at law, when Defendant could have instead sought a motion to compel or other, more targeted relief from the Court.

Third, none of the facts cited by Plaintiff fall afoul of L.R. 56.1, which requires a statement of facts accompanying a summary judgment motion to contain page references to affidavits, depositions, and other documentation.  (See ¶¶ 3-6, 8-17, 19-21, 29-48, 66-70, Docket

No. 150).  L.R. 56.1 "was adopted to expedite the process of determining which facts are genuinely in dispute, so that the court may turn quickly to the usually more difficult task of determining whether the disputed issues are material." *Brown v. Armstrong*, 957 F.Supp. 1293, 1297 (D. Mass. 1997).  Bank Defendants have complied with the spirit of the rule by providing pincites to paragraphs or short exhibits where page numbers would be less useful for the Court's purposes.

Fourth, none of the paragraphs cited by Plaintiff contain immaterial, irrelevant, or misleading information which is subject to a motion to strike.  The paragraphs include information about the status of the mortgage and Property ownership (¶ 3); MCS' contract with Chase (¶ 10); information about Plaintiff's lease and the condition of the Property (¶¶ 25, 29), and the actions of MCS' field agents at the Property (¶¶ 37, 46); excerpts from police reports related to the Property and the dispute (¶¶ 55-60); and Plaintiff's bankruptcy filings concerning the value of the personal property which he now alleges Defendants or their agents damaged or stole. (¶¶ 74-82).  Furthermore, ¶¶ 5, 6, 7, 9, 10, 12, 13, 14, 15, 18, 23, 28, 30, 33, 34, 35, 41, 43, 44, 45, 56, 72, 73, 84, and 86 are supported by affidavit evidence authenticated by personal knowledge, and thus do not lack foundation or support.

Fifth, while hearsay cannot be considered at summary judgment, ¶¶ 15, 16, 19, and 46 do not contain hearsay.  *See Davila v. Corporacion de Puerto Rico Para La Difusion Publica*, 2007 WL 2253531 (1st Cir. Aug. 7, 2007).  ¶¶ 15, 16, and 19 cite provisions of the contract between Chase and CMS, which is provided in full in the record and is authenticated by the Benavidez Affidavit. (*See* Docket No. 146).  ¶ 46 cites an MCS Property Inspection Report which is a business record authenticated by the Benavidez Affidavit, and is not an out-of-court statement. The Benavidez Affidavit satisfies Fed. R. Civ. P.'s 56(c)(4)'s requirement that affidavits or

declarations supporting a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

¶ 62 cites to a statement in a police report the author attributed to an MCS field agent who reported to the Property while Plaintiff was there, causing Plaintiff to call the police.  While police reports may be admissible in civil cases under Fed. R. of Evid. 803(8)'s public records exception, "hearsay statements by third persons . . . are not admissible under the [public records] exception merely because they appear within public records." *U.S. v. Mackey*, 117 F.3d 24, 28 (1st Cir. 2017).

Therefore, Heal's motion to strike ¶ 62 is ***granted*** as it contains double hearsay.  The rest of the motion is ***denied***.

### 2.   Plaintiff's Second Motion to Strike (Docket No. 163)

Plaintiff also seeks to strike MCS' Statement of Material Facts (Docket No. 145) on similar grounds.  Plaintiff objects that certain paragraphs should be struck for: 1) failure to identify witnesses to be called at trial; 2) failure to comply with L.R. 56.1; 3) failure to sufficiently "identify" the Benavidez Affidavit or list Mr. Benavidez as a witness; 4) immateriality or lack of support or foundation; and 5) hearsay.

Again, Plaintiff has not provided any legal precedent that a defendant's failure to disclose potential trial witnesses with its initial disclosures warrants striking its entire statement of material facts.

Second, MCS has complied with L.R. 56.1 in that it has provided pincites in lieu of page numbers when citing to parts of the record where page numbers would not help the Court easily locate the source material.

Third, information provided by the Benavidez Affidavit can be considered at summary judgment even if Benavidez has not been identified as a trial witness.  There is no requirement within the Federal Rules of Civil Procedure that an affiant providing affidavit testimony for summary judgment be listed as a trial witness, so long as the affiant provides testimony based on personal knowledge, sets out facts that would be admissible in evidence, and would be competent to testify at trial.  *See* R. 56(c)(4).

Fourth, I find that ¶¶ 6, 19, and 40 do lack foundation, although the citations to the underlying record could have been more precise.  ¶¶ 3, 10, 25, 29, 32, 48, 55-6, and 74-82 are not irrelevant or immaterial, as they cite to information about the Property mortgage (¶ 3); MCS' business (¶¶ 10, 55); the condition of the Property as observed by police officers on certain dates relevant to the dispute (¶¶ 25, 29, 32); Plaintiff's own estimate of damages (¶ 48); Plaintiff's valuation of his personal property from his bankruptcy proceedings (¶ 56), and Plaintiff's deposition testimony (¶¶ 57, 58).  Plaintiff also contends that ¶¶ 59, 60, and ¶¶ 74-82 are immaterial or irrelevant, but MCS' Statements of Facts ends with ¶ 58, so I am not sure where those objections are aimed.  (Docket No. 145 at 8).

Fifth, Plaintiff is correct that ¶ 28, which contains a statement in a police report that a neighbor called the Police Department to report a person at the Property, constitutes double hearsay (hearsay within a public record).  It will therefore be struck.  Otherwise, the motion is ***denied***.

### 3.  Plaintiff's Third Motion to Strike the Benavidez Affidavit (Docket No. 164)

Plaintiff also seeks to strike the Affidavit of Gary Benavidez, the Assistant Vice President of MCS, on the grounds that Benavidez was never identified as a trial witness for MCS or Bank Defendants, that he lacks personal knowledge about the information contained in his Affidavit,

and that he reproduced certain MCS inspection reports of the Property in black and white, when MCS provided the same reports to Plaintiff in color.

First, as explained above, there is no requirement in Fed. R. Civ. P. 56 that a party must designate every summary judgment affiant as a trial witness which would compel me to strike Mr. Benavidez' Affidavit.  Moreover, R. 26(a)(3)(B) does not require parties to disclose trial witnesses until 30 days before trial, and we have not reached that point in time.  Furthermore, the purpose of mandatory witness disclosure under the Federal Rules is "to avoid trial by ambush;" and there was no unfair surprise here because Benavidez was designated as MCS' R. 30(b)(6) witness, and Plaintiff was able to depose Benavidez on December 10, 2020.  *Macaulay v. Anas*, 321 F.3d 45, 50 (1st Cir. 1992); *see* Benavidez Dep., Docket No. 157-15.

Second, the Benavidez Affidavit satisfies R. 56(c)(4)'s requirement that affidavits or declarations supporting a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  It is reasonable that a senior executive at a corporation would have personal knowledge of that company's operations and electronic recordkeeping, which are the types of documents submitted with the Benavidez Affidavit.

Third, I find that submitting the MCS property inspection reports in the Benavidez Affidavit in black and white rather than color was harmless.  I have compared the color photographs included in Plaintiff's submission with the black and white photographs in MCS' submission and find that colored ink does not provide any relevant information that aids either party to meet their burden supporting or opposing summary judgment.

Plaintiff's third motion to strike is ***denied***.

### 4.  Bank Defendants' Motion to Strike Plaintiff's Affidavit (Docket No. 166)

Bank Defendants seek to strike all or substantially all of Plaintiff's Affidavit (Docket No. 160) opposing their motion for summary judgment on the grounds that it impermissibly seeks to: 1) change Plaintiff's deposition testimony after the fact and after Defendants moved for summary judgment; 2) introduce evidence not based on Plaintiff's personal knowledge, or which constitutes legal conclusion or speculation; and 3) relitigate prior Court rulings on the scope of discovery.

First, the motion is granted as to the errata sheet which purports to change Plaintiff's deposition testimony. Under R. 30(e), a party may make form or substantive changes to their deposition testimony within 30 days of the receipt of the deposition transcript, so long as they provide a signed statement listing their changes and the reasons for them.

Plaintiff was deposed on January 29, 2021, and submitted his errata sheet on February 26, 2021, eleven days after the deadline for dispositive motions on February 15, 2021.  (*Compare* Heal Aff. and Errata Sheet at Docket No. 157-7 at 4 *with* Docket Nos., 143, 148).  Because the errata sheet was submitted after the Defendants' summary judgment motions, it will be analyzed under the framework of the sham affidavit rule, which prohibits parties who have given a clear answer to an unambiguous question at deposition from creating a disputed issue of fact to avoid summary judgment by offering an affidavit with contradicts their earlier testimony without providing a satisfactory explanation of why the testimony has changed.  *Torres v. El Dupont De Nemours & Co.*, 219 F.3d 13, 20 (1st Cir. 2000); *Maga v. Hennessy Industries, Inc.*, 2014 WL 10051399 at *8 (D. Mass. Dec. 1, 2014).

At deposition, Plaintiff gave contradictory testimony when asked about his entitlement to equitable relief on Count 1 (forcible entry), first stating "I don't believe that I would have a right for equitable, you know, relief. You know, I'm not sure" and later possibly implying the

opposite: "I don't believe I would *not* have the right to ask for an injunction, or you know, possession.  And certainly not, you know, quit forever. That's a little extreme."  (Heal Dep. 165:14-16, 166:15-19, Docket No. 151-14) (*emphasis added*).  Equitable relief is the only type of relief the Complaint demands on Count 1, so Plaintiff's waiver of that relief at deposition would be significant.

Now that Plaintiff has read Bank Defendants' summary judgment motion which relies on his deposition testimony to dispose of Count 1, he seeks to amend his testimony to make a forceful assertion about his right to equitable relief which directly contradicts his deposition answers: "After consideration, my rights to possession of the Property at 8 Linden St., Winchendon, Massachusetts is superior to Chase, which is a trespasser.  I have the right to obtain an injunction against Chase.  An injunction against Wells Fargo would not change my right to possession as opposed to its [right to possession]."  (Errata Sheet, Docket No. 157-7 at 4.).  Not only would allowing such contradictory testimony thwart the sham affidavit rule, Plaintiff also did not comply with R. 30(e) by providing a reason for the amended statement on the errata sheet.

Second, I agree that Plaintiff's 19-page, single-spaced Affidavit contains dozens of paragraphs which provide legal conclusions or arguments rather than testimony based on personal knowledge, as is required for affidavits supporting summary judgment motions.  Many of Plaintiff's "facts" are legal arguments about what provisions in the mortgage mean or what Massachusetts law guarantees— they belong in a legal brief, not a summary judgment affidavit. (*See, e.g.* ¶ 26: "The provisions of the I-4 Rider applying to lease and renting of the Property is subject to the implied covenant to quiet enjoyment of the Property during its possession;" ¶ 60: "Gary Benavidez has submitted an affidavit, speaking from his personal knowledge and not as

the keeper of the records.  This affidavit would not be admissible at trial and the Court should disregard it;" ¶ 95: "I am not restricted to seeking injunctive relief against the Defendants. M.G.L. C. 184 § 18 allows for money damages as well as equitable relief.").  Many others are obviously not based on Plaintiff's personal knowledge or are speculative.  (*See, e.g.* ¶ 21: "There is no evidence that Wells Fargo ever appeared in court in order to allow it to enforce the provisions of the mortgage.").  Many of Plaintiff's assertions of fact about Defendants do not contain citations to the record for support, and are unfounded.

Third, Plaintiff has improperly used the Affidavit to rehash discovery disputes that the Court has already considered at length, including his inability to locate and depose MCS' field agents within the extended and ample time provided for discovery.  (*See* ¶¶ 67-74, 78-83).

Applying R. 56(c)(4)'s rule that affidavits are based on personal knowledge, set forth facts admissible in evidence, and must show the affiant is competent to testify on the matter in the affidavit "requires a scalpel, not a butcher knife."  *Perez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001).  However, so much of Plaintiff's Affidavit violates the Federal Rules that it would be an inefficient use of the Court's time to parse through the Affidavit line by line to rescue those few paragraphs which comply with R. 56(c)(4).  Bank Defendants' Motion to Strike the Heal Affidavit at Docket No. 160 is therefore ***granted***.

### 5.  MCS' Motion to Strike Plaintiff's Declaration (Docket No. 170)

MCS seeks to strike significant portions of Plaintiff's Affidavit opposing its motion for summary judgment (Docket No. 156), as well as the Affidavits of Salustia Ortiz, Joseph La Casse, and Joseph Presti attached to Plaintiff's Declaration, a separate document opposing MCS's motion for summary judgment. (Docket Nos. 157, 157-16, 157-17, and 157-18).

Plaintiff's Affidavit contains improper legal arguments or statements of law rather than statements of fact based on his personal knowledge.  ¶¶ 11, 14, 15, 22, 25, 33, 34, 35, 36, 44, 45, 46, 47, 50, 52, 63, 64, 65, 68, 76, 78, 79 are struck for failure to comply with R. 56 (c)(4).

MCS' motion to strike the Ortiz and Presti Affidavits are granted. I have already capped the measure of damages for Plaintiff's antique gold coin at the inflation-adjusted value he attributed to the coin in his prior bankruptcy proceedings, so the Presti Affidavit's appraisal of the coin's market value is immaterial and will be disregarded.  (Order on Motion for Summary Judgment at 5-5, Docket No. 46; Order Denying Motion for Reconsideration, Docket No. 48).

The Ortiz Affidavit, prepared by Plaintiff's current employer, contains mostly irrelevant information about Plaintiff's health and real estate work; Ortiz does state that Plaintiff told her in 2013 that "he was suffering break-ins at his home" and "was very upset" but she claims no personal knowledge about whether Defendants were involved or who was responsible.  (Docket No. 157-16 at ¶¶ 5, 11-12).  Indeed, the key issue here is not *if* MCS field agents entered the Property (the record is replete with dated reports and pictures documenting the occasions when agents entered the Property, and what they did), but *whether they were legally authorized to do so*, and what, if anything, they removed from the Property—nothing in the Ortiz Affidavit helps resolve either issue.

Unlike the Ortiz and Presti Affidavits, the LaCasse Affidavit does contain information about the conditions at the Property based on the affiant's personal knowledge, gleaned during two visits there.  However, the affiant does not provide a date certain for either visit, so the information cannot inform the Court's summary judgment analysis.  (Docket No. 157-17 at ¶¶ 5-7).  Of special concern, the Affidavit appears to be in draft form, with edits from Plaintiff

second-guessing LaCasse's account of when he visited.  (¶ 5).  MCS' motion to strike is ***__granted__***

***__in part and denied in part__***, in accordance with the reasoning above.

### B.  Bank Defendants' Motion for Summary Judgment

1.  <u>Forcible Entry (Count I)</u>

Count One alleges that Defendants' actions violated M.G.L. c. 184, § 18, which bars self-help

evictions. § 18 provides that:

> **"§ 18. Entry into land; legal proceedings required to recover possession of**
> **land or tenements; jurisdiction**.
> No person shall make an entry into land or tenements except in cases where his
> entry is allowed by law, and in such cases he shall not enter by force, but in a
> peaceable manner.
> No person shall attempt to recover possession of land or tenements in any manner
> other than through an action brought pursuant to chapter two hundred and thirty-
> nine or such other proceedings authorized by law. The superior and district courts
> shall have jurisdiction in equity to enforce the provisions of this section."

As a threshold matter, Plaintiff's request for equitable relief on Count 1 is moot.  Plaintiff

"prays of the Defendant an order requiring then [sic] quit up the property and [sic] forever,"

which the Court interprets as a request for a permanent injunction banning MCS and Bank

Defendants from the Property.  (Compl. ¶ 38).  However, the Property was foreclosed and sold to

Wells Fargo Bank at public auction three years ago, and the validity of that foreclosure has not

been challenged.  (Docket No. 151-3).  The Court has no right to permanently exclude Wells

Fargo from its own property, nor has Plaintiff, as the former owner's tenant, established his legal

right to exclude others from the Property post-foreclosure.  It is also unclear whether a federal

Court could issue injunctive relief, as the Commonwealth's statute only conveys jurisdiction to

enforce § 18 to Massachusetts superior and district courts.

Both Bank Defendants and MCS urge the Court to grant the motion because Plaintiff

testified at deposition that he did not believe that he was entitled to injunctive relief, and that the

permanent relief sought (barring Defendants from entering the Property forever) would be "a little extreme." (Heal Dep. 166:5-19, Docket No. 147-2). Had Plaintiff made this argument at the summary judgment hearing in his capacity as an advocate, the Court would certainly hold it against him. However, the question called for a legal conclusion, and Plaintiff was testifying as a fact witness concerning his own *pro se* claims. For that reason, I decline to indulge the Bank Defendants by throwing out Count I on that basis.

The crux of Plaintiff's forcible entry argument is that Bank Defendants or their agents' actions[4] exceeded the scope of their authority under the mortgage to take reasonable or appropriate steps to protect the Bank Defendants' interest in the Property and in fact constituted a self-help eviction.

I find that Plaintiff has not created a genuine dispute of material fact that the property preservation actions "since late 2010" were unreasonable under the terms of the mortgage. (Heal Aff. ¶ 3, Docket No. 156). Paoluccio consented to interior inspections if he abandoned the Property or became delinquent on his loan payments. It is true that Bank Defendants have not provided sufficient evidence that the inspections did not begin until Paoluccio's mortgage loan became delinquent. The only evidence to that effect is MCS' testimony that property preservation activities are automatically triggered when a mortgage loan becomes delinquent, but that general policy does not speak to the status of Paoluccio's mortgage during the period alleged in the complaint. (*See* Nguyen Dep. 27:11-15, Docket No. 160-8). However, MCS had the right

---

[4] Bank Defendants dedicate as much of their brief to their argument that they are not vicariously liable for MCS or its field agents' actions at the Property as they do to arguing that they are entitled to summary judgment even if the Court found them vicariously liable. Because I find that Bank Defendants are entitled to summary judgment based on the merits and Plaintiff's lack of evidence, I will not address whether, as Bank Defendants claim, they are not liable for MCS or its field agents' actions because MCS is their independent contractor.

to secure the building because it intermittently appeared to be abandoned or improperly

maintained.  As the log of the inspections at the Property shows, from July 2011 to January 2018

the Property vacillated between occupied and vacant and was poorly maintained.

      Additionally, there was no lack of required notice.  Contrary to Plaintiff's claim that the

mortgage requires prior notice before any interior inspections, Bank Defendants are only

required to give notice "at the time of or prior to" an inspection. (*Compare* Compl. ¶ 23 ("While

the mortgage gives the lender to make reasonable inspections, if the mortgagee will seek to

inspect the interior of the building, a notice is required beforehand") *with* Mortgage, ¶ 7 ("Lender

shall give Borrower notice at the time of or prior to such an interior inspection specifying such

reasonable cause.")).  Photographs from MCS field agents' reports establish that vacancy notices

were posted at the Property on numerous occasions alerting any occupants that "this property has

been determined to be vacant and abandoned" and advising them to "call MCS immediately" if

the property was not occupied or abandoned or "the property may have its locks replaced and/or

plumbing systems winterized in the next few days" to prevent "waste and/or deterioration."

(*See, e.g.* July 11, 2012 Rep., Docket No, 157-10 at 6; October 10, 2013 Rep, Docket No. 146-9

at 5; June 11, 2012 Rep., Docket No. 146-6 at 6; Nov. 10, 2013 Rep., Docket No. 146-11 at 6;

Feb. 7, 2014 Rep., Docket No. 157-4 at 5; Nov. 28, 2016 Rep., Docket No. 146-15 at 6).  Bank

Defendants also sent letters directly to Paoluccio.  (*See* Docket No. 150, ¶ 45).  Where MCS field

agents found the Property was occupied they took no action.  (*See* Jan. 9, 2014 Rep., Docket No.

157-2; Aug. 26, 2016 Rep., Docket No. 157-2 at 7; Sep. 15, 2017 Rep., Docket No. 157-2 at 13;

Mar. 14, 2017).  Plaintiff acknowledged that he saw the notices and, at some undefined date, left

one voicemail message for MCS.  Plaintiff produced no evidence confirming that call or any

other evidence that Bank Defendants or MCS should have known the Property was not

abandoned on the occasions when they entered the interior of the Property to change the locks, shut off utilities, or perform winterization.

Between July 2012 and January 2018, MCS changed the locks, added a coded lockbox to the front or side door, or entered the apartment to winterize the plumbing at least 14 times, but Paoluccio only contacted MCS once to ask that the lockbox be removed.  Meanwhile, field agents continued to visit the house and report new damage, including a broken window and missing copper pipes. (Docket No. 157-6 at 6 (copper pipes), 18 (broken window)).  The photographs taken from outside the porch looking into the kitchen window show that the interior of the house was routinely in disarray, and the yard was erratically maintained.  In fact, the Property appeared to be vacant for months at a time.  MCS' reports are corroborated by Office Ross and Sgt. Anair's personal observations of the Property.  Given these dynamics, it was reasonable as a matter of law for MCS to conduct regular inspections, carry out winterization orders once a year, and secure the Property as needed to prevent further damage.

This holding is consistent with established First Circuit precedent on trespass actions against property preservation companies operating under identical mortgage provisions as paragraph ¶ 7 and ¶ 9 in Paoluccio's mortgage.  In *Galvin*, the First Circuit affirmed that exterior and interior inspections, winterization, and change locks are reasonable property preservation actions as a matter of law where the mortgaged property was a substantial asset, it was unoccupied for much of the year, the owners had been in default for between 2-5 years, and there was no evidence in the record that such a degree of diligence did not conform to industry norms or was unreasonable.  *Galvin v. U.S. Bank, N.A.*, 852 F.3d 146, 162-65 (1st Cir. 2017).  Like Plaintiff, the homeowners in *Galvin* sued their mortgage lender for trespass.  Between December 2011 and November 2014, property preservation agents visited the Galvins' property 26 times,

and entered the home twice to change the locks and perform winterization.  *Id.* at 164.

Paoluccio's Property was also a valuable asset: the promissory note tied to the mortgage was

valued at $142,000 in 2006.  (Docket No. 1-6 at 1).  While the MCS field agents entered the

interior of the Property 14 times to perform winterization or change the locks, compared to just

twice in *Galvin*, there the property owners had warned the mortgagor against trespass and had

given notice that they were properly maintaining the property.  *Galvin v. U.S. Bank National

Ass'n I*, 2015 WL 5822627 (D. Mass. Oct. 1, 2015).  Where the Bank Defendants here had no

such assurances and MCS agents appeared to believe that Plaintiff was a squatter with no right to

occupy the Property, it was reasonable for them to conduct more frequent inspections, winterize

the building, and secure it.

Bank Defendants' motion for summary judgment as to Count I is ***granted***.

2.  <u>Trespass to Chattels (Count III)</u>

Count III states a claim against MCS and Bank Defendants for transporting Plaintiff's

personal possessions from the Property, including unenumerated items which were kept "in

locked areas," and seeks replevin and punitive damages. (Compl. ¶ 51).  As with Count I

(forcible entry), Plaintiff did not provide the dates for the alleged trespass in the Complaint.  Nor

did he provide a list of the items taken.  In discovery, Plaintiff disclosed that Bank Defendants

and Defendants had dispossessed him of or damaged: an antique gold coin, wedding band, string

trimmer, welding kit, fireproof box, cigarette lighter, nail puller, mattress, bedding, a Lisa

computer, a telescope, office furniture, and two Imagewriter computers. (Pltfs' Second Amended

Answers to Bank Defendants' Interrogatories ¶¶ 5-7, Docket No. 151-17; Pltf's Revised 21(a)(6)

Disclosures at 8-9, Docket No. 151-16).  Bank Defendants make no claim that removing any of

those items would be reasonable under their power pursuant to the mortgage to take reasonable steps to protects its interest in the abandoned Property.

Under Massachusetts law, "[o]ne who commits a trespass to chattels is subject to liability to the possessor of the chattel if, but only if, (a) he dispossesses the other of the chattel, or (b) the chattel is impaired as to its condition, quality, or value, or (c) the possessor is deprived of the use of the chattel for a substantial time, or (d) bodily harm is caused to the possessor, or harm is caused to some person or thing in which the possessor has a legally protected interest." *Smith v. Wright*, 2013 Mass. App. Div. 24 (Dist. Ct. 2013) (citing RESTATEMENT 2D OF TORTS § 218).

After two years of discovery, Plaintiff has produced no evidence that Bank Defendants, MCS, or one of MCS' field agents dispossessed him of any of the personal property he claims was taken. An MCS Report produced in discovery indicates that on June 26, 2014, one day before Plaintiff filed a larceny complaint for loss of the gold coin with the Winchendon Police, a field agent completed a secure order at the Property. (Docket No. 157-6). The field agent posted a vacancy notice, changed the locks, and secured the front door with a lock box, but did not report removing any personal property the interior. (*Id.*). Plaintiff has no evidence to dispute this account—no dates, no identity of a responsible party—that would allow a reasonable jury to find Bank Defendants liable.

Even if Plaintiff had discovered evidence to create a genuine dispute over whether the items in his inventory were interfered with or taken away, he has not explained why Bank Defendants should be liable for the act of an MCS field agent. Trespass to chattels is an intentional tort. Assuming *arguendo* that Bank Defendants could be held liable under Plaintiff's vicarious liability theory for the field agents' actions, "[a]n employer may only be held vicariously liable for an intentional tort of an agent if the tortious act or acts were committed

within the scope of employment." *Worcester Ins. Co. v. Fells Acres Day School, Inc.*, 408 Mass. 393, 404-05 (1st Cir. 1990).  Removing Plaintiff's personal possessions from the Property would fall outside the scope of the agent's employment, as the MCS Work Order explicitly bars agents from removing personal property without submitting a bid and getting prior approval.[5]  (Docket No. 157-6 at 5).  The June 23, 2014 Work Order does not contain an approved bid to remove personal property, so if the agent did indeed remove or damage any of the items which Plaintiff disclosed, that would fall outside the scope of her employment and Bank Defendants would not be liable.  Nor is there any evidence that Plaintiff's personal property was removed on any other date in the record.

Bank Defendants' motion for summary judgment as to Count III is ___**granted**___.

### 3.   Conversion (Count IV)

Plaintiff's conversion claim is identical to his trespass to chattels claim, though some of the items listed above which were damaged but not removed from the Property would not be subject to a conversion claim. (Compl. ¶¶ 55-59).  Again Plaintiff provided no details of which items were stolen until discovery.  (*Id.*).

Under Massachusetts law, to recover for conversion a plaintiff must prove that a defendant "intentionally or wrongfully exercise[d] acts ownership, control or dominion over personal property to which he ha[d] no right of possession at the time . . ." *Abington Nat'l. Bank v. Ashwood Homes, Inc.*, 19 Mass.App.Ct. 503, 507 (1985).  Like trespass to chattels (Count III),

---

[5] Specifically, the June 23, 2014 MCS Work Order states: "Line Item: REMOVE PERSONAL PROPERTY PER CU YD INT.  Instructions: *Bid all work EXCEPT lock change/grass cut/winterization if personals present.  Complete lock change/grass cut/winterization if ordered and if in season.  Do not remove personal property or complete debris removal, hazard removal, etc.  Submit bids for work needed.*"  (Docket No. 157-5 at 29).

conversion is an intentional tort.  Not only has Plaintiff failed to produce any evidence that his personal property was stolen by an MCS field agent, even if it were, the MCS Work Order for the date of the alleged theft proves that such conduct would fall outside the scope of that agent's employment and thus Bank Defendants could not be held liable.  *Worcester* at 404-05.

Bank Defendants' motion for summary judgment as to Count IV is ***granted***.

## C. **MCS' Motion for Summary Judgment**

Bank Defendants and MCS moved separately for summary judgment, but their arguments are symmetrical.  Just as Bank Defendants argued that they could not be liable for any actions imputed to MCS because MCS is an independent contractor, so MCS argues it cannot be liable for the actions of its field agents because they are independent contractors.  Specifically, MCS alleges that each of its field agents executes a standard MCS Field Services Agreement stipulating that they are independent contractors, who must, among other requirements, provide their own tools and equipment.  (MCS Statement of Material Facts ¶ 17, Docket No. 145; Docket Nos. 146-2, 146-3, 146-4).  Because MCS' motions for summary judgment can also be resolved on the substantive merits of forcible entry, trespass to chattels, and conversion causes of action alleged, dissecting the contractual relationships between MCS and its field agents would be superfluous.

### 1.  Forcible Entry (Count I)

Count I against MCS for forcible entry concerns the same conduct as Count I against Bank Defendants.  As analyzed above, *see supra* Part IV.B.1, the field agents' entries into the Property's interior to winterize the plumbing, conduct inspections, change locks, shut off the utilities, and nail windows shut were reasonable and appropriate acts authorized by the mortgage

to prevent a reduction in value, given that the Property appeared to be abandoned at the time and neither Plaintiff nor Paoluccio substantively responded to the multiple posted vacancy notices.

The Court also finds MCS' argument that frequent inspections are reasonable and appropriate because an unkempt exterior can lead to municipal code violations to be persuasive.

   2.   <u>Trespass to Chattels (Count III)</u>

For the same reasons as previously stated with respect to Count III against the Bank Defendants, MCS's motion for summary judgment as to Count III is ***<u>granted</u>***.  Plaintiff has no evidence of trespass to chattels to create a genuine dispute for trial, and even if he had, any such conduct by an MCS field agent would be outside the scope of their employment, meaning that MCS could not be held liable.

   3.   <u>Conversion (Count IV)</u>

For the same reasons as previously stated with respect to Count IV against the Bank Defendants, MCS's motion for summary judgment as to Count IV is ***<u>granted</u>***.  Plaintiff has no evidence of the alleged conversion to create a genuine dispute for trial, and even if he had, any such conduct by an MCS field agent would be outside the scope of their employment, meaning that MCS could not be held liable.

<u>**Conclusion**</u>

For the reasons stated above, Plaintiff's Motion to Strike Bank Defendants' Statement of Material Facts (Docket No. 162) is ***<u>granted in part and denied in part</u>***; Plaintiff's Motion to Strike MCS' Statement of Material Facts (Docket No. 163) is ***<u>granted in part and denied in part</u>***; Plaintiff's Motion to Strike the Benavidez Affidavit (Docket No. 164) is ***<u>denied</u>***; Bank Defendants' Motion to Strike Plaintiff's Affidavit (Docket No. 166) is ***<u>granted</u>***; and MCS'

Motion to Strike Plaintiff's Affidavit (Docket No. 170) is **_granted in part and denied in part_**

(Docket No. 170).  Bank Defendants and MCS' motions for summary judgment (Docket Nos.

143, 148) are **_granted_** on all counts in accordance with this memorandum of decision.


**SO ORDERED.**

**/s/ _Timothy S. Hillman_**
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**
